Thank you. Good morning. My name is William Christie, along with my co-counsel Jill Bessonette. We represent the Libertarian Party of NH. This case involves an unconstitutional infringement on the ability of a third party to obtain access to the general election ballot in the Under NH law, a third party can get on the ballot by obtaining signatures equal to 3% of the total votes cast in the prior general election. Traditionally, a third party, such as the Libertarian Party, has had 21 months to complete this task, roughly from the date of the prior general election to August 1 of the election. I'm glad you've started this way, because one of the questions I had for you is, if the present law didn't have a predecessor, would you be attacking the present statute as unconstitutional, too burdensome on your party? You mean, if there had always been 7 months to collect the signatures? Correct. Yes, we would be challenging it as unduly burdensome, based upon a 7-month window. Okay, so does it actually matter to this case that there was a change, which I take it you claim is more burdensome than the prior statute? Well, yes, I think it matters that there was a change, because as far as looking at burden, the case law suggests that one of the issues a court should look at is prior history. Although not dispositive, it is a factor to look at. And under prior history, even with the 21-month window that previously existed, it was difficult for third parties to obtain ballot access in a state in New Hampshire. That strikes me sort of odd when we're judging the constitutional minimums or maximum prerogatives here, because then it would suggest that a state that had been beneficent in its amount of time could constitutionally be more restricted than a state that had not. It would seem to me that you would prefer instead to have some uniformity as to how much effort is constitutionally too much. Actually, Your Honor, I believe the case law speaks to an opposite impulse, in that we should not compare necessarily state by state in saying, for instance, what's good for Kentucky is also good for New Hampshire, because each state has differing election schemes. No, but if we look at the overall burden, sure, there's different schemes, so you've got to look at the different elements. You've got to look at number of signatures. You've got to look at time. You've got to look at the advance time. You've got to look at the commencement date. But when you look at all of that, why would we hold that citizens of one state must bear a greater burden than citizens of another state? Well, the burden, maybe I'm misunderstanding the question, but the burden under the Anderson test is not the burden on the citizens of the state, but on the party trying to, the individual trying to comply with the election law. Sure, those citizens. I'm sorry, I misunderstood. So yes, I think you look at the burden. Can the law be complied with in a seven-month period? And the record in this case, we believe, establishes that it's burdensome in that sense. How do you deal with the Barr case? Because our decision in Barr, they had, we said it wasn't even a modest burden. It was only a modest burden to have to gather 1% of the signatures within 60 days. And now New Hampshire is saying 3% in 210 days. That doesn't seem, actually on a day per signature basis, you get longer than we said was modest in Barr. Respectfully, that language in Barr, obviously it exists. It's briefed by both parties. But that was not the issue in the case in Barr, whatever. And there was no record in Barr whatsoever on the burden of a third party to collect signatures in any time frame. The issue in Barr was whether or not the candidates that got the Libertarian Party not at the convention could substitute and collect based upon the signatures that had been previously collected by an opponent. There is no requirement under Massachusetts law to collect signatures within 60 days. Well, how about the Libertarian case then in the 11th Circuit? There it seemed like they had more to do than you have to do. Well, what this case, we think, is more analogous to than the 11th Circuit case is the case from the District of Rhode Island. Stay with me. What we're to say about the 11th Circuit case is that they had 188 days to do 3%. You have 210 days to do 3%. So do we distinguish the 11th Circuit opinion or do we say we disagree with it? I think we distinguish the 11th Circuit opinion by the uniqueness of the election law scheme that exists here in New Hampshire. What is different about the election law schemes that would be relevant to this issue? First, the difference here in New Hampshire, it is the only election law scheme that hasn't been stricken down that puts the collection period smack dab in the middle of the general election year, that you have to collect these signatures starting on January 1, when through party building process and through other mechanisms that may exist, whether you're a third party or one of the two major parties, you also need to be engaged in fundraising and campaigning and other electioneering activities. That's what makes the New Hampshire law different from the law, I believe, in the 11th Circuit case and what makes it exactly the same as the law that was at issue in Block, the case from the District of Rhode Island. Secondly, another major difference is the purported interest. Why can't that fundraising be done in the prior year or even the electioneering? Some fundraising may be able to be done in the prior year. I think the case law, Anderson itself, speaks to this, that especially with the burdens that exist on third parties in general, pushing off organizational activities, making third parties raise money, making them organize, making them recruit candidates further and further away from the actual date of the general election, creates a burden on a third party and makes it more difficult to an unconstitutional degree in some circumstances for that third party to compete in the political process. The problem with this law, unlike the 11th Circuit law, is that not only do these burdens exist, that it's very difficult to raise money in, let's say, September or October of the odd year leading up to the general election. People are less enthused. But it also means that they have to sit on the sidelines. That was the language from Barr. And they can't be doing the mechanics of getting ready for the election, which is collecting the necessary signatures in order to get on the ballot for the general election cycle. So the other issue that I... So the argument is there are certain basic activities any third party has to engage in, and it's a burden to compress the time in which they do these activities? Yes. We raised three principal burdens in the case. One was the time frame itself. And the seven-month period, and there are certain issues unique to New Hampshire which make the seven-month period difficult. Basically, petitioning has to be done outdoors, and trying to stop people in the wintertime when it's cold is obviously much more different than it is in the summertime or in the fall. And based upon the... to why the wider window is appropriate on an evidentiary basis in this case, you look at the efforts to get on the ballot in 2000 and 2012. One of the more frugal periods was in the late summer and early fall in the odd year when there is a lot of political activity going on in New Hampshire in that period of time, both because of old home day parades and county fairs, but because of the lead-up to the presidential primary. In a sense, you have a peculiar burden because New Hampshire may be the single most politicized state I know, given it's the first and for many years has had the initial primaries. I don't know if it's different in North Dakota, but I tend to think it might be. And the expectation of your population is constant political activity, I think. I think that's true. And part of that is also not only the presidential primary, but the term of the governor is two years. So there's always a... every general election always has some activity around it because there's either a presidential election or a gubernatorial election or a senatorial election going on. And so that increases the burdens. Also forcing the collection time frame to... How does that increase the burden? You have a hyped-up populace up there who is always expecting some kind of political activity. I don't understand how that increases rather than helps. Yeah, it increases the burden because the period of time where the two major parties or where major parties are able to organize in the off year and then focus in the general election year in additional fundraising or campaigning, what this law does, as similar to what the Rhode Island law did in block, was forces the third party to wait. And they have to wait until January 1 to start collecting signatures. The cost of collecting signatures also goes up in a general election year because I think we all like to sit there and our thoughts of democracy and signatures are collected at bake sales or little league games. But in modern politics, the people that collect signatures are paid petitioners. And the cost of a paid petitioner goes up in an election year because the competition not only amongst third parties but individuals trying to get ballot questions on ballots, whether it's in Massachusetts or elsewhere, the competition for that goes up, which drives up the cost to get on the ballot by forcing this entire process into the election year. It also puts off the period of time where individuals who are interested in running on the ballot as a third party candidate in the state of New Hampshire can campaign. The evidence below was that it is obviously tougher to campaign as a third party candidate than as a candidate as one of the two major parties. That can be true, but what is inconsistent between campaigning, hello, I hope to be the candidate, and I'd appreciate your signing the petition drive at the same time. Why are they inconsistent activities? Yes, the record of why they're inconsistent is that it's in one of the trial exhibits that is in our appendix is that the focus on petitioning is to gather signatures, to gather as many signatures as you can in a short period of time, whereas the focus on campaigning is interacting with the voter, trying to get them to buy into your view or get them to support your view. The second difference is, as I just touched upon, in today's political cycle, the people who are partitioning are paid professionals. They're skilled at it. They're not libertarians. They're not Democrats. They're not Republicans. They're getting paid per signature. They're not interested in trying to convince those people to vote. This seems to cut against you because you make a very good practical point that petitions these days are generated by people going around who are paid to doing it. So that means that from the politicians or the people forming the party's view, what this is all about is raising money. If you raise $50,000, you'll get on the ballot. If you don't raise $50,000, you won't be able to afford enough of those people walking around handing out the petitions. And this statute puts no restriction on when you can raise the money. You could start that 10 years earlier. As a legal matter, it does not put on any restriction on when you can start raising money. As a practical matter, and I think Anderson speaks to this particularly, that especially with a third party, forcing a third party to engage in fundraising and other organizational activities far away from the general election, when interest may be lesser or when interest in an alternative to one of the two major parties may be lesser, can create an unconstitutional burden on that party. Secondly, money, there's no case I'm aware of prior to this decision that makes money such a focal point of whether the law is burdensome or not. I would suggest it falls into the litmus test language of Anderson, that we're not going to apply litmus tests. This is an exercise in balancing. There's other administrative burdens that go on as well, such as the time frame that exists. The shorter time frame makes it very difficult to judge the verification rate. And that from the examples of the prior two election cycles when the Libertarian Party was able to complete the process, by starting early, they were able to determine whether or not what their verification rate was, and in both cases it was roughly 75%. In this case, the evidence was that if they have to wait until after January 1 or have to wait until the middle of the election year, they'll have no idea whether or not they are gathering signatures at a rate that is actually going to meet the statutory threshold, because as a practical matter, about 25% of signatures collected end up being unverified. Thank you. Thank you. Ms. Lombardi. May it please the Court, Laura Lombardi representing the New Hampshire Secretary of State, William Gardner. Here, the District Court promptly concluded that the State's interest in making sure that a political party has a sufficient showing of support before running a full slate of candidates on the ballot would not outweigh any minimal burdens that were caused by the New Hampshire's ballot access statute. And I think it's important to note that the burden here was on the Libertarian Party to show what the burdens were created by the statute. And the facts of this case showed that there were, if anything, very minimal burdens created by the statute. First of all... Can I ask a question? I'm just curious. It was your, the Secretary of State, which went to the legislature and said, gee, we have a little amendment we'd like you to pass. And the basic purpose for the amendment was to make it easier for the people who had to verify the signatures in each city and town. You put that in the legislative history. And then it drops out of this case and isn't mentioned. And in fact, an employee from the Secretary of State's office says, oh, no, it wouldn't actually have that beneficial effect. So I'm sort of curious about whether you now are relying on that, although it's not mentioned in your brief, as a justification for the change, or whether you just think the larger rationale takes care of everything. We're not relying on that argument relating to the validity of the signatures at this time. But I think it's important to note you do look at the statute as it exists now and not necessarily how it previously existed. So the purpose of the original statute, you look at the statute in total, is to show that there is sufficient enough support to appear on the ballot. And that is an argument that we've raised throughout the litigation. And in applying the Anderson verdict balancing test, there's no requirement that you look to the underlying what was discussed in the legislative history at the time an amendment was made. It also is not, the state does not need to show that there was a problem before making a change to their election law regulation. It just seems a little odd for you to be proposing this change and then an employee from your office gets up and says, oh no, there is no problem, there was no justification for this change. Another justification for the change at the time was also to align it with the independent individual candidate petitioning process, which placed the start date at January 1st. So here, we're a third party by gaining access to the ballot that can put a full slate of candidates on the ballot and excuse those individuals from having to comply with the petition gathering obligations for individual candidates. It makes sense for that period to fall within the same time frame, starting January 1st. And I would like to note that there have been cases that have dealt with regulations that did place the petition gathering within the election year. In the 11th Circus case discussed earlier, the petition time started January 12th. And also in the American Party of Texas v. White, the candidate in that case was not allowed to start gathering petitions until after the primary, which was in May, and also could not gather any petitions that had been signed by individuals who voted in either of the major party petitions, primaries. So in that case, there were even more stringent requirements, and that was upheld. So here, looking first at the seven-month time period, if you look at the facts of this case in 2012. Once you switched justifications, how does starting in January correlate with sufficient interest in the party any more than the prior legislative scheme, which allowed more time? Well, here, for one thing, allowing less time shows that the party does have sufficient support because they, and I think you would compare to the Support versus resources, maybe. Support and resources go one and together. And I think the standard, as the court talked about in Storer v. Brown, would be you look at the regulation as it exists and ask whether a reasonably diligent candidate could be expected to satisfy the signature requirements. So looking at the regulation as it exists today, a seven-month period has been upheld, not specifically, but shorter time periods have been upheld,  And in this case, if you look to the facts of the Libertarian Party's efforts in prior years, in 2012, within the first two-month time period of gathering signatures, they were able to gather 75%. So under that rate of gathering, three months would have been sufficient. So in terms of the facts of this case, looking at the efforts previously to gain access to the ballot, seven months is clearly a reasonable amount of time. And also... How do we measure these burdens? Because what's odd about these cases is usually you have a legitimate constitutional aim, and then you have some collateral effect that causes a burden, and then we weigh the burden with reference to the importance of the aim. Here what's interesting is the legitimately recognized constitutional purpose is to place a burden on very small parties that they need to carry before they can get on the ballot, simply to say we don't want anyone who can't carry that burden on the statute, and that's the purpose. So how in that context do we say whether 1%, 3%, 5%, 20 days, 360 days, what's our measuring stick? Well, I think you can measure both by looking at other case law and other situations where courts have upheld signature requirements, and you can also look to facts presented in the specific case, which here would be the 2012 petition gathering process, which would support our argument that within three months, even if a party waited until after all the winter months have been completed, they would still have all of the spring and the summer to gather petitions. And the argument that a candidate could not campaign at the same time that the party is also raising, gathering signatures, I think is countered by the facts in this case that the Libertarian Party's candidate for governor, he was focusing on campaigning during the petition gathering during that time period. So the party can engage the paid petitioners, which in 2012 is essentially what they relied on primarily, was paid petitioners, leaving the candidates free to campaign during that time. I have two questions on New Hampshire law. Is it lawful to gather petitions outside polling places in New Hampshire? Outside polling places? Yes. I believe it is. And then is New Hampshire, I believe it's a town meeting form of government in most of your smaller communities? Correct. And are those every year in the spring? Depending on the town or the city, but primarily in the spring for most of them. And again, in this case, that was another fact that showed that during the 2012 petitioning effort, the Libertarian Party had the opportunity, both at the presidential primary and at the spring polling places of the town elections, to go out and gather petitions. And they were unable to gain more than a couple petitioners to go out, volunteers, and collect petitioners on their behalf. So in New Hampshire, is it customary to put the signature drives, put those people at the polling place to pick up voters and ask them at that point, would you be willing to sign a petition so the Libertarian Party is on the ballot at the next election? Yes. It is common for people to do that? I believe so, yes. And then they have the opportunity in May as well? Correct. And here, the Libertarian Party primarily used paid petitioners originally, but during the time period when they were trying to seek volunteer efforts was when both the presidential primary and the town elections occurred. And they were not able to gather enough support to go out and collect sufficient petitioners. Do we know anything about, apart from the issue of who is paid, where the most successful places are to sign up people? Do we know that at voting places, your rate of return on the day that you get a vote is not as high as it would be at a sandwich fair? I would think at the polling places it would be. He would think that, but do we know? In terms of this case, the burden was on the Libertarian Party to show, and I believe there was some testimony that county fairs were a good place and that they couldn't go to county fairs in the fall. But simply the inability to gather petitions at every possible opportunity during the county year does not make a burden unreasonable. Is there any evidence specifically you had 500,000 people turn out to vote in February primaries, something like that? Correct. Is there any evidence in the record that the Libertarian Party was not allowed to gather signatures of people as they were going to and exiting those 500,000 people at the polling places in New Hampshire? I don't believe that they have engaged in a party petitioning effort for this election period. The evidence all related to 2012, and it showed that they were unable to get sufficient volunteers to go out and gather the petitions. Not that there was anyone preventing them from gathering them, but simply without the money being sent from the national party, they did not have the support within New Hampshire to engage in those efforts successfully. Suppose you had a state that didn't have any elections other than in January of presidential years. Would that case be different than this? Because New Hampshire does have other elections and other opportunities. I think it still would be sufficient. I think a seven-month time period, petition gatherers can go anywhere to gather petitions. In the spring and the summer, there's farmer's markets they could attend. There are other opportunities where they can gather signatures. You would look at the facts of the case, though, specifically, to determine whether the burden was unreasonable. I think here the record clearly supports the trial court's decision that it was not an unreasonable burden. You have three more minutes. Is there anything else you'd like to say? Yeah, I think turning to the state's interest, I think it's well settled that the state has a legitimate interest in ensuring that a party has sufficient support before running a full slate of candidates on the ballot. And the plaintiffs here don't dispute that. They more dispute the time period. I think the case law amply supports that the time is more important than the time is sufficient in order to meet that interest. And that the states, in terms of a change from the prior regulation, states don't have to show that there's been voter confusion before amending their regulations. And I think here they just have to show that it is a reasonable regulation and it is supported by the state interest. So if there are no further questions, I'd ask that you affirm. Thank you. Thank you.